**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**


**HARRY STEPHENS FARMS, INC.; and
HARRY STEPHENS, individually and as
managing partner of STEPHENS PARTNERSHIP**                    **PLAINTIFF**


**V.**                          **2:06CV00166 JMM
                              2:07CV00278**


**WORMALD AMERICAS, INC.,
Successor to ANSUL, INC.; and
HELENA CHEMICAL CO., INC.
EXXON MOBILE CORPORATION
Successor to MOBIL CHEMICAL CO.**                          **DEFENDANTS**


## <u>ORDER</u>

Pending is Defendants' joint motion for summary judgment.  (Docket # 72).  Plaintiffs have

responded and Defendants have filed a reply.  For the reasons stated below, Defendants' motion is

granted.


<u>Facts</u>

Plaintiffs' claims arise from the disposal of various chemicals at a chemical plant commonly

known as the Cedar Chemical site located in the Helena-West Helena Industrial Park in Phillips

County, Arkansas.  Plaintiffs own and cultivate several hundred acres of farmland which borders the

industrial park.  Plaintiffs allege that Defendants conducted operations at the chemical plant which

resulted in soil and water contamination of their property.  Defendants argue that Plaintiffs' claims

are time barred.

Harry Stephens Farms, Inc. ("Stephens Farms") is an Arkansas corporation incorporated in

1971.  Harry G. Stephens III, commonly known as Harry G. Stephens, ("Stephens") owns 78% of

Stephens Farms, his sister owns 11% and his two sons each own 5.5%.  Stephens has served as the manager and president of Stephens Farms from 1993 through 2006.  Stephens Partnership was formed in 1993.  The partners of Stephens Partnership are Stephens, Stephens Agco, Inc., and Bypass Agco, Inc.  Stephens is and has served as the president of Stephens Agco, Inc. since its incorporation in 1993.  Stephens is and has served as the president of Bypass Agco, Inc. since its incorporation in 1993.  Stephens is and has served as the only managing partner or chief officer of Stephens Partnership.  Stephens was the sole person associated with the Plaintiffs who made the decision to file the present action on behalf of Stephens Farms and Stephens Partnership.

Stephens Farms owns farmland in Phillips County, Arkansas which borders an industrial complex where the former Cedar Chemical Corporation chemical plant ("Cedar Facility") is located ("Farmland").  From 1993 to the present, Stephens Farms has cash-rented its Farmland to Stephens Partnership.  The Defendants are alleged to have released contaminants into the ground at the Cedar Facility which ultimately contaminated the water and soil on the Farmland.

On October 19, 1994, Stephens, on behalf of Stephens Farms, signed an Access Agreement ("1994 Access Agreement") with Cedar Chemical Corporation ("CCC"). The purpose of the 1994 Access Agreement was to permit CCC's consultant to "sample, analyze and monitor groundwater" in "areas on [Stephens Farms'] property" in connection with CCC's investigation of the Cedar Facility. Plaintiffs acknowledge that this agreement was signed by Stephens but deny any knowledge of the purpose of the investigation.  Plaintiffs affirmatively state that they were never informed of the reason for the investigation and were refused access to any results of the groundwater sampling on their property.

Defendants contend that CCC's investigation of the Farmland was required as part of an

2

agreement it reached with the Arkansas Department of Pollution Control and Ecology (now the Arkansas Department of Environmental Quality ("ADEQ")) to investigate conditions at its Cedar Facility.  Plaintiffs' deny this allegation.

Sometime after its October 19, 1994 execution date, either in 1994 or 1995, test wells were placed on the Farmland, pursuant to the 1994 Access Agreement, as well as on adjacent land rented by Stephens Partnership.  Defendants contend that Stephens knew that the test wells placed on the Farmland and the adjacent land rented by Stephens Partnership pursuant to the 1994 Access Agreement were placed there so as to test for water and soil contamination.  Plaintiffs affirmatively state that they were unaware of the reasons for the placement of the test wells.

Defendants contend that the deposition testimony of Stephens establishes that he became "worried" that the groundwater at the Farmland might be contaminated following his execution of the 1994 Access Agreement.  Plaintiffs state that following the 1994 Access Agreement, Stephens became concerned as to why the wells were placed on his property and made every reasonable effort to determine the purpose of the wells.  Plaintiffs contend that Shephens was assured that there was nothing to worry about and was repeatedly told that his property was not contaminated. Plaintiffs also contend that Stephens was denied access to test results and only became aware of the contamination when notified by the Arkansas Department of Health in November of 2004.

In July 2001, as part of the investigation of contamination from the Cedar Facility, EnSafe, Inc. ("EnSafe") sampled monitoring and irrigation wells on the Farmland. Defendants allege that during that July 2001 sampling, Stephens talked with an EnSafe employee and expressed his concern that contamination in the groundwater at the Farmland would prevent the use of his irrigation wells before the end of the growing season. When the EnSafe employee told him that the

results of the sampling would not be available until after the end of the growing season, Stephens

expressed relief at his ability to continue using the wells that year without interference. Plaintiffs

deny this allegation and state that Stephens spoke with an Ensafe employee during the 2001 sampling

and was told that there was no contamination of his property.

In a September 21, 2001, Groundwater Monitoring Report for the Facility, prepared by

EnSafe and submitted to ADEQ, EnSafe reported that 1,2 dichloroethane (also known as "EDC")

had been detected again in off-Facility monitoring wells and in irrigation wells on the Farmland.

EnSafe further noted in its 2001 Report that the owner (Stephens Farms) of the irrigation well in

which EDC had been detected had been contacted.  Plaintiffs deny receiving any notification from

EnSafe.

On January 9, 2002, Stephens, on behalf of Stephens Farms, signed an Access Agreement

("2002 Access Agreement") with CCC.  The purpose of the 2002 Access Agreement was to permit

CCC's consultant to "sample, analyze and monitor groundwater" in "areas on [Stephens Farms']

property" in connection with CCC's groundwater investigation of the Cedar Facility.   Again,

Plaintiffs deny that they had knowledge the sampling was performed in connection with CCC's

groundwater investigation of the Cedar Facility. Plaintiffs state that they were never given a reason

for the groundwater sampling and were intentionally mislead as to the reasons for the sampling.

Defendants claim that CCC's investigation of the Farmland was required as part of an

agreement it reached with ADEQ to investigate conditions at its Cedar Facility and that  Stephens

understood in 2002 that samples were wanted from the test wells or holes that were already out on

the Farmland and adjacent land Stephens Partnership rented because contamination was being looked

for from the Cedar Facility. Plaintiffs deny this allegation.

The 2002 Access Agreement required that notice be given to Stephens Farms, Inc. prior to any entry upon its land by CCC or its consultant. Stephens recalls occasions, after his execution of the 2002 Access Agreement, when people came out, gave him notice, and had him start the well pumps.

CCC filed for bankruptcy on March 8, 2002. Sometime in mid-2002, after CCC's March 2002 bankruptcy filing, Stephens visited the Cedar Facility office and met with Greg Satterfield, the Facility's acting Plant Manager. According to Satterfield, during this meeting, Stephens complained about the contamination in his wells and asked Satterfield, "What does [CCC] intend to do about my wells now that it is in bankruptcy?" Satterfield told Stephens that he did not know what CCC planned to do, but that he would get an answer for him. Following his meeting with Stephens in mid-2002, Satterfield contacted John Miles, a former plant manager of the Cedar Facility. Satterfield told Miles - who still held responsibilities at the Cedar Facility - about his meeting with Stephens. Miles agreed to travel to West Helena to follow up on Satterfield's conversation with Stephens. In the summer of 2002, Miles visited the Cedar Facility and spoke personally with Stephens. During his meeting with Miles in the summer of 2002, Stephens told Miles that he wanted to know if CCC was going to install a new irrigation well for Stephens to replace the contaminated well. Stephens also stated to Miles that he knew that the use of one or more of his irrigation wells could be prohibited because of the possibility of exposing his farm workers to contamination in the well water.

Plaintiffs deny these allegations and state that during the meeting between Stephens and Satterfield in mid-2002 Stephens was once again assured that his property was not contaminated and if something came up in the future it could be fixed with a cheap filter. Plaintiffs state that Stephens was again assured that his property was free from contamination in a meeting with Miles and

5

Satterfield.  Plaintiffs claim that Stephens specifically asked Miles if his property was contaminated and Miles told him that his property was not contaminated and if something happened to come up in the future it could be fixed with a cheap filter.

<u>Standard for Summary Judgment</u>

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry is the threshold inquiry of determining whether there is
> a need for trial -- whether, in other words, there are genuine factual
> issues that properly can be resolved only by a finder of fact because
> they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979).  The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to
> demonstrate, *i.e.*, '[to] point out to the District Court,' that the record
> does not disclose a genuine dispute on a material fact.  It is enough
> for the movant to bring up the fact that the record does not contain
> such an issue and to identify that part of the record which bears out
> his assertion.  Once this is done, his burden is discharged, and, if the
> record in fact bears out the claim that no genuine dispute exists on
> any material fact, it is then the respondent's burden to set forth
> affirmative evidence, specific facts, showing that there is a genuine
> dispute on that issue.  If the respondent fails to carry that burden,

summary judgment should be granted.

*Id.* at 1339. (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th Cir. 1988) (citations omitted)(brackets in original)).  Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 248.

<u>Discussion</u>

Defendants argue that Plaintiffs' claims are barred by Arkansas's three-year statute of limitations.  Defendants assert that the limitations period commenced not later than October 19, 1994, when Stephens Farms and Cedar Chemical Corporation executed a written Access Agreement. Defendants state that from the 1994 Access Agreement itself and the circumstances as Plaintiffs' understood them in 1994, Plaintiffs knew or should have known of the existence of alleged environmental contamination causing a remediable injury to their property and that the source of the environmental contamination was the Cedar Facility.

Plaintiffs, relying on the affidavit of Harry G. Stephens, contend that subsequent to the placement of test wells on Stephens' property, he made every diligent effort to ascertain the results of the sampling that was conducted on his property and upon each inquiry, he was assured that his property was not contaminated and was denied access to the actual reports generated as a result of the sampling.  Plaintiffs contend that they became aware of the contamination in November 2004.

Defendants argue that they have submitted admissible evidence showing that the Plaintiffs were aware of the alleged contamination more than three years before their June 9, 2006 Complaint and that the Plaintiffs' claims are barred by the statute of limitations.  Defendants argue that the Court should not consider Stephens' self-serving affidavit that contradicts his sworn deposition

7

testimony.  The Court must first determine whether the conflict between Stephens affidavit and his earlier deposition testimony creates a genuine issue as to any material fact.

In *Camfield Tires, Inc.  v. Michelin Tire Corp.*, 719 F.2d 1361, 1363 (8th Cir. 1983), the Court addressed the issue of whether summary judgment may be granted when one of the parties, after giving deposition testimony, later files an affidavit with directly contrary statements.  The Court held that an affidavit filed by the plaintiff in opposition to a motion for summary judgment that directly contradicted the plaintiff's previous deposition testimony was insufficient to create a genuine issue of material fact under Rule 56. *Id*. at 1365.  The Court stated:

> The very purpose of summary judgment under Rule 56 is to prevent "the assertion of unfounded claims or the interposition of specious denials or sham defenses ...." 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2712 (1983). If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own earlier testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

> *Id*.

The Court finds that the affidavit of Stephens directly conflicts with his deposition testimony in several key areas.  Plaintiffs rely on the affidavit of Stephens wherein he states: "From the period of time of 1994 through 2002, I made several inquiries of persons working at Cedar Chemical company about the results of the tests conducted using the water wells on my property and each time I was verbally assured there was no contamination of my property and I was verbally assured that even if there was 'something in the wells, it could be fixed with a cheap filter.'" Stephens affidavit testimony also contends that in 2002 he met with John Miles and Greg Satterfield on separate occasions and at each meeting, he was assured this his property was not contaminated.  Stephens claims to have made "every diligent and reasonable attempt to determine if [his] property was

8

contaminated and was repeatedly assured that there was 'no problem.'".

In contrast, during Stephens' deposition, completed on March 23, 2007, Stephens testified that he never talked to anyone who was employed by or claimed to be representing . . . Cedar Chemical about a contamination related issue. (Stephens' deposition, p. 42, l. 20-24). Stephens did recall "one time one person . . . I wanted to know something about what they were doing. And they said, when I asked him, he said, you know, if they find something it's a real simple, real cheap to put a filter on it, you don't have to worry about it . . . " (Id., p. 43, l. 14-19). Stephens was repeatedly asked if he spoke with anyone else about contamination and Stephens referred back to this one conversation. (Id., p. 69, l. 5-10, p. 120, l. 13-20). Stephens also denied having any conversations with Greg Satterfield and John Miles ( Id., p. 71, l. 21-25; p. 72, l. 1; p. 80, l. 17-22) and denied making any efforts in the 1990's to find out the results of the ground water sampling. (Id., p. 79, l. 1-4). Because the affidavit statements are in direct conflict with Stephens' deposition testimony, the Court cannot find a genuine issue of material fact based upon these assertions.

The Arkansas Supreme Court has adopted the "discovery rule" to determine when a cause of action for property damage accrues under Ark. Code Ann. §16-56-105. *Arkansas v. Diamond Lakes Oil Co.*, 347 Ark. 618, 623, 66 S.W.3d 613, 616 (2002). The Eighth Circuit has acknowledged and applied this "discovery rule" for claims for property damage from environmental contamination. *Highland Indus. Park, Inc., v. BEI Defense Systems Co.,* 357 F. 3d 794 (8th Cir. 2004). In *Highland*, the Court held that the statute of limitations "does not begin to run until the plaintiff knows, or reasonably should have known, that its land had suffered a remediable injury. . . ." *Id*. at 796.

Plaintiffs admit that on October 19, 1994, Stephens signed an Access Agreement with Cedar

9

Chemical Corporation which permitted CCC consultants to sample, analyze and monitor groundwater in areas on Stephens' property.  Although, Stephens denies that he had knowledge of the reason for the investigation, his deposition testimony reveals that he was "worried" from the beginning.  (P. 72, l.19-20).  The affidavit of Jeff Bennett, a former Project Manager for EnSafe, Inc. establishes that in July 2001, Stephens and Bennett engaged in a conversation in which Stephens expressed concern that he would be prevented from using his irrigation wells in his farming operations that year due to contamination.  Further, the 2001 EnSafe report indicates that 1,2 dichloroethane had been detected in the monitoring wells on the Farmland and Stephens had been notified.  The affidavit of Greg Satterfield, a former Lab Manager and Quality Assurance Manager at CCC establishes that Stephens came to the Facility office in the late spring or early summer of 2002 and inquired of Satterfield "what does Cedar intend to do about my wells now that it is in bankruptcy?"  Satterfield states that Stephens made it clear to him in the 2002 meeting that he knew that at least one of his farm irrigation wells was contaminated, that the contamination came from the Cedar Chemical Facility, and that he was concerned about it.  The affidavit of John Miles, former Plant Manager of CCC establishes that in a meeting with Stephens during the summer of 2002 Stephens wanted to know if CCC was going to install a new irrigation well for him to replace the contaminated well.  Mr. Miles states that it was clear to him from the conversation in the summer of 2002 that Stephens was aware of the groundwater contamination on his property and specifically that the contamination had been detected in one of his irrigation wells.

The Court finds that Stephens knew or reasonably should have known of the contamination on his property and the source of that contamination as early as October 1994, but no later than the summer of 2002.  Accordingly, Plaintiffs' complaint, filed July 20, 2006 is time barred.

10

Wherefore, Defendants' motion for summary judgment, docket # 72 is granted.

IT IS SO ORDERED this 24th day of October, 2007.

James M. Moody
United States District Judge